Commonwealth *v.* Ellsworth, Appellant.

506

Argued November 29, 1962.   Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Paul Yermish,* for appellant.

*Burton Satzberg,* Assistant District Attorney, with him *Arlen Specter,* Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 8, 1963:

In this homicide trial did the trial judge commit reversible error in permitting the Commonwealth to introduce into evidence against the defendant Ellsworth declarations made, in Ellsworth's absence, by one Wilson, allegedly Ellsworth's co-conspirator, which declarations—in large part narrations of past events—implicated Ellsworth in the homicide and were made after both Wilson and Ellsworth had been arrested and incarcerated?

On July 4, 1955, Lulu Rossman, a 76 year old widow, was found dead in a hotel room in Philadelphia. Her

death was due to a strangulation which occurred during the course of a robbery and the time of her death was fixed as the early evening of July 3, 1955. From her killing arose the events which later culminated in the arrests and subsequent convictions at separate trials, of Raymond Wilson, R. W. Thomas, Gus DeMoss and Frank Ellsworth (the present appellant) of murder in the first degree with the penalty fixed at life imprisonment. The judgments of sentence against Wilson and DeMoss were affirmed on appeal to this Court: *Commonwealth v. Wilson*, 394 Pa. 588, 148 A. 2d 234; *Commonwealth v. DeMoss*, 401 Pa. 385, 165 A. 2d 14. Thomas' judgment of sentence is presently on appeal to this Court.

The factual background and the events which preceded and succeeded the homicide are set forth at length in both *Wilson*, supra, and *DeMoss*, supra. Only such background as is necessary for a disposition of the narrow question before us will be related.

"The theory of the Commonwealth was that Thomas, through his relationship with Mrs. Rossman, became aware of her habit of having large sums of money on her person or in her living quarters at all times. Motivated by a desire to obtain this money, Thomas entered into a conspiracy with [DeMoss], a police officer in Tulsa, Oklahoma, [Ellsworth] and [Wilson] to rob Mrs. Rossman. In 1948, Thomas, then a Tulsa police officer, with DeMoss, had arrested and testified against both Ellsworth and Wilson when they were charged and convicted of 2nd degree burglary. In pursuance of the conspiracy, the Commonwealth contends, Ellsworth and Wilson went to Philadelphia and in the early evening of July 3, 1955 caused Mrs. Rossman's death by strangulation and took from her room a considerable amount of money.": *Commonwealth v. Wilson*, supra, pp. 591, 592.

The Commonwealth proved that on July 6, 1955— after the robbery and homicide—Wilson and Ellsworth,

using assumed names, flew from Tampa, Florida, to Tulsa, Oklahoma, and then went to Las Vegas, Nevada, where they were taken into custody on July 7, 1955.[1] At that time Wilson, in Ellsworth's presence, denied that he had ever seen Ellsworth. When Ellsworth was picked up he had in his possession $6700 in $100 bills[2] and a key to a room in a Las Vegas hotel wherein was found $69,000 of which $66,200 was in $100 bills. After questioning Wilson and Ellsworth were released. Later on, Wilson was arrested in Las Vegas on a warrant issued in connection with this homicide and there placed in jail. In the meantime, Ellsworth had gone to Memphis, Tennessee, where he was arrested and placed in jail on a warrant issued in connection with this homicide.

The declarations, the admissibility of which into evidence is herein attacked, were allegedly made by Wilson to one Edward Nixon, his cellmate in the Las Vegas jail. At the time such declarations were made Ellsworth was in jail in Memphis. As set forth in the opinion of the court below, Nixon testified "that Wilson conversed with him over a period of several days, that he tried to get a bond for Nixon's release so Nixon could go to Florida and procure certain witnesses for Wilson's extradition hearing on the charge against him in Philadelphia. These witnesses would swear that Wilson and Ellsworth were in a taproom in Tampa around the time of the robbery-murder, according to the testimony by Nixon about Wilson's statement to him. Nixon also testified that Wilson gradually told him

---

[1] They were not taken into custody in connection with this homicide but on suspicion because of their possession of large sums of money, principally in $100 bills.

[2] The importance of these bills in denominations of $100 and the serial numbers of these bills and the manner in which such bills were traced into the possession of Mrs. Rossman are set forth at length in *Wilson*, supra, pp. 595, 596.

all about the crime, and that Ellsworth had gotten 'rambunctious' and killed Mrs. Rossman when she made some sort of disturbance." An examination of Nixon's testimony clearly indicates that Wilson in his statements to Nixon implicated Ellsworth in the robbery and murder and revealed his plan to establish an alibi both for Ellsworth and himself. Such testimony was highly prejudicial to Ellsworth; if its reception into evidence was error, such error demands a reversal of the judgment of sentence against Ellsworth.

In *Commonwealth v. Wilson,* supra, similar testimony of Nixon was admitted into evidence *against Wilson, the declarant*; the admission of such testimony under those circumstances was most proper: *Heine v. Commonwealth,* 91 Pa. 145, 148; *Commonwealth v. Epps,* 298 Pa. 377, 380, 148 A. 523. *Wilson,* however, in no wise acts as a precedent for the admission of Nixon's testimony in the case at bar.

In *Wilson,* supra (p. 607) we reiterated a well settled exception to the hearsay rule: "The declarations or acts of one conspirator made to third parties in the absence of his co-conspirator are admissible in evidence against *both* provided that such declarations [or acts] were made during the conspiracy and in furtherance of the common design: Com. v. Spardute, 278 Pa. 37, 49, 122 A. 161; Com. v. Biddle, 200 Pa. 640, 645, 50 A. 262; Heine v. Com., 91 Pa. 145, 148; Com. v. Jermyn, 101 Pa. Superior Ct. 455, 471." (Emphasis supplied) Foundations for the application of this exception to the hearsay rule must be laid by proof that (a) a conspiracy did exist between the declarant and the person against whom the evidence is sought to be offered (*Commonwealth v. Petrillo,* 338 Pa. 65, 12 A. 2d 317) and (b) that the declarations were made while the conspiracy was in existence and in furtherance of its purpose (*Commonwealth v. Johnson,* 365 Pa. 303, 317, 74 A. 2d 144; *Commonwealth v. Petrillo,* supra, 82, 83;

*Wagner v. Haak, Aulenbach,* 170 Pa. 495, 499, 32
A. 1087). In *Wagner,* supra, we said: "The declarations of a coconspirator are evidence against the others, only as long as the conspiracy continues; if made afterwards . . ., they are not evidence . . . ." (p. 499) With these legal principles both the Commonwealth and the defendant are in accord; the area of their disagreement arises in the applicability of these principles to the facts in the case at bar.

An examination of the instant record readily reveals that the Commonwealth sustained its burden of proving the first prerequisite to the introduction of Wilson's statements, i.e., that there was a conspiracy in which not only Thomas and DeMoss but also Wilson and Ellsworth were fellow conspirators. While the defendant does not concede that a conspiracy was proved, he does not, for the purpose of this argument, seriously dispute such proof.

The more serious and important question is whether at the time Wilson made the alleged statements to Nixon the conspiracy was in being or had terminated. The Commonwealth contends that, while generally the commission of the crime which was the object of the conspiracy will mark the termination of the conspiracy, there are conspiracies which involve the commission of a crime wherein the object of the conspiracy will not be attained by the commission of the crime itself, i.e., where the proceeds of a crime have not yet been secured, where the proceeds of a crime have been secured but not divided, etc.: 22A C.J.S. Criminal Law §770. With that general proposition we agree but our problem is to determine whether the conspiracy in the case at bar had *in fact* been terminated at the time Wilson made his statements.

The goal of the conspiracy was the robbery of Mrs. Rossman and all the events which transpired and all the actions of the conspirators were motivated by the

attainment of that goal. Such goal encompassed the robbery itself, the proceeds of the robbery and the division between the conspirators of the proceeds. Of course, in attaining such goal it was inherent in the conspiracy that all appropriate steps be taken, before and after the robbery, to avoid the detection of any of the conspirators. At the time Wilson made his statement to Nixon the robbery had been completed and its success established by the large amount of money secured. The Commonwealth contends that, although all the conspirators met in Florida immediately after the robbery and although Thomas and DeMoss may have received their shares of the proceeds, yet as between Ellsworth and Wilson there had not been a division of the proceeds. In line with that argument the Commonwealth points to the evidence that Ellsworth and Wilson travelled westward together, that the $69,000 found in the Las Vegas hotel room was in a room jointly occupied by them and that they were in Las Vegas to exchange "hot" money for "safe" money before a division took place. The defendant takes the position that, accepting as he must the evidence in the light most favorable to the Commonwealth, the evidence clearly reveals a division of the proceeds between all the conspirators in Florida.[3]

In its opinion the court below took the position that the conspiracy was still in existence at the time Wilson made his statements. In its opinion there had been no split between Wilson and Ellsworth of the "loot" from the robbery, the money was still in their joint possession, Wilson and Ellsworth were still engaged in joint efforts to exchange "what could be well

---

[3] Of course, the defendant's position is that he took no part in the robbery, received none of the proceeds thereof, etc. But, accepting for the purpose of the argument the evidence in the light most favorable to the Commonwealth, the defendant takes the position a division had been an accomplished fact.

identifiable money into money which could not be traced" and that even Wilson's attempt to set up an alibi for Ellsworth and himself was all part of a continuing conspiracy. We do not so read this record. In our view, this conspiracy had come to an end, if not before, certainly at the time of the arrests and incarcerations of both Wilson and Ellsworth in connection with this crime. Even if Wilson was attempting while in jail to set up an alibi for himself and Ellsworth such efforts were not in continuance of the old, but in the commencement of a new, conspiracy.

Some reliance was placed by the court below upon *Commonwealth v. Ott*, 154 Pa. Superior Ct. 647, 36 A. 2d 838, *Commonwealth v. Strauss*, 89 Pa. Superior Ct. 82, *Commonwealth v. Jermyn*, 101 Pa. Superior Ct. 455, and *Heine v. Commonwealth*, 91 Pa. 145. In our opinion these decisions are not controlling in the instant situation. In *Ott*, supra, while the declarant when he made the declaration to the police officer was then under arrest, the trial judge instructed the jury to consider the declarations as evidence only against Tenaglio, the declarant, and not against Ott with whom he was being tried. In *Jermyn*, supra, the declarations were made against Jermyn during the course of the conspiracy and before any arrest had been made. In *Strauss*, supra, the declarations were made long after the fire—the object of the conspiracy—had taken place but prior to the time any money had been collected from the insurance companies, allegedly sought to be defrauded, and before any arrest had taken place.[4] In *Heine*, supra, the declarations were made after the termination of the conspiracy and were held improperly admitted, the Court stating that declarations of a

---

[4] In *Strauss*, supra, the Court said: "Only those acts and declarations are admissible under the rule which are done and made while the conspiracy is pending and in furtherance of its object." (p. 91)

conspirator "when not made during the progress of the fraudulent scheme but afterwards, and, as in this case, in a mere rehearsal to a third party of what has previously been done . . . are not evidence: . . . ." (p. 148).

The defendant urges that the arrest and incarceration of the conspirators per se terminated and concluded the conspiracy. In our view, the conspiracy between Wilson, Ellsworth and the others had been concluded prior to the arrest and incarceration of Wilson. However, any doubt as to the termination of this conspiracy was certainly resolved by the arrests and incarcerations of Wilson and Ellsworth and the declarations of Wilson were made after the conclusion of the conspiracy. Under such circumstances, Wilson's alleged statements were clearly inadmissible as against Ellsworth.

It is most regrettable that, after a long and costly trial at which the Commonwealth presented evidence which so emphatically pointed to the guilt of this defendant, a new trial must be granted. However, the admission of this evidence gravely prejudiced the defendant and deprived him of the fair and impartial trial to which he was entitled. Unfortunately, an overzealous prosecution has overplayed its hand and, in so doing, has created an error which demands a retrial of the whole case.

Judgment of sentence reversed and a new trial granted.